## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **Jennifer Gilmore**       Plaintiff <br><br> v. <br><br> **Joe Beveridge,** in his individual capacity <br> * <br> **Brent Kiger,** in his individual capacity <br> * <br> **Jim McMullen**, in his individual capacity <br> * <br> **Joe Beveridge,** in his official capacity, as board member of the Olathe Board of Education <br> * <br> **Olathe Public Schools USD 233** <br> * <br> **Olathe Public Schools Board of Education** for Olathe Public Schools USD 233 <br><br> Defendants | 2:22-cv-02032-HLT-RES |

### AMENDED VERIFIED COMPLAINT

COMES NOW the plaintiff Jennifer Gilmore, by and through counsel, and for her Verified Amended Complaint against each defendant, hereby states as follows:

1. Jennifer Gilmore ("Ms. Gilmore") is a natural parent of her child which is also a student in the Olathe school district.

### JURISDICTION AND VENUE

2. This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C.§ 1983.

1

3. Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges the defendants' violation of the plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

4. This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

5. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district. This Court retains jurisdiction over the case and controversy as all parties legally reside or operate within Johnson County, Kansas, within the bounds of the District of Kansas, and are subject to service therein.

THE PARTIES

6. Plaintiff Jennifer Gilmore is a natural person, citizen of Kansas, and legal resident of Johnson County, Kansas.

7. Defendant Joe Beveridge is a natural person who was elected board member of the Olathe Board of Education of USD 233, which constitutes the governing body of the District. As a member of the School Board, the Board defendant Beveridge, in his official capacity, exercises final policymaking authority for policies that govern the District, including the policies governing speakers at public meetings. He is sued in his official and individual capacities.

8. As president of the School Board, the defendant Beveridge's authority and powers include oversight and control of the public meetings.

9. Defendant Beveridge's duties include, among others, authorizing, executing, enforcing, and implementing the policies governing the public during public comments at a public meeting at the District.

10. As the Board President, defendant Beveridge directly oversees the defendant Kiger and McMullen regarding the cessation of speaker's speech and their removal from the public meeting and the building.

11. As an individual and Board President, the defendant Beveridge is and was aware of the retaliatory and unconstitutional actions authorized by and occurring under the challenged policies and has not instructed District personnel, including the other defendants, to change or alter either the policies or the actions taken pursuant to those policies to comply with constitutional mandates.

12. Defendant Brent Kiger is a natural person and is employed by the Olathe School District as the Director of Safety Services. He is sued in his individual capacity.

13. Defendant Jim McMullen  is a natural person and is employed by the Olathe School District as Assistant Superintendent of Middle School Education. He is sued in his individual capacity.

14. Defendants Olathe Public Schools Board of Education for the Olathe Public Schools USD 233.  Through its members the Board of Education is responsible for, among other things, the adoption and authorization of policies that govern speaker conduct and expression at public meetings in the District, including the policies challenged herein.  Through its members of the School Board, the Board exercises

3

final policymaking authority for policies that govern the District, including the policies governing speakers at public meetings.

15. The Board, through its members, are responsible for the enactment, amendment, and repeal of District policies, including those challenged herein.

16. As elected members of the School Board, the Board possesses the authority to change and enforce the policies challenged herein.

17. The Board has not modified the policies governing public speaking at public meetings  challenged herein to comply with constitutional mandates.

18. Each member of the Board, including the Board member defendant Joe Beveridge, acquiesces in, sanctions, approves, and supports the actions of the other Board member and each defendant in enforcing the policies and procedures governing speakers at public meetings, including the policies challenged herein, against Ms. Gilmore.

19. The Board, including defendant Beveridge, have been aware of the retaliatory and unconstitutional actions authorized by and occurring under the past and current challenged policies, including, but not to the exclusion of others, the removal of speakers such as Ms. Gilmore from a public meeting and the building in which the public meeting is conducted because of a purported speech code violation, and have not instructed District personnel, including the other defendants, to change or alter either the policies or the actions taken pursuant to those policies to comply with constitutional mandates.

20. None of the defendants have instructed District personnel, including the other individual defendants, to change or alter the policies and practices challenged herein to comply with constitutional mandates or to change the way those policies are applied to speakers including Ms. Gilmore.

## STATEMENT OF FACTS

### *Olathe's Censorship Policies and Practices*

21. Defendant Olathe School Board's official policy provides that the "general public shall be invited to attend all board meetings, except executive sessions." Policy Manual, Section B, Title "Public Participation" ("Policy").

22. The Manual states that "any patron wishing to speak to the board is encouraged to notify the clerk of the board five (5) days prior to the meeting and state the reason(s) for the request."

23. Jennifer ran for a board seat for the Olathe school board in 2021.

24. Jim Randall is an elected Johnson County Republican precinct committeeman who sent out an email to Cedar Creek neighbors advocating for his daughter (Democrat) Julie Steele (newly elected Olathe board member) claiming that Jennifer had received PAC money for her board campaign: that her goal was to privatize the public school system (which was not a goal of Jennifer when she ran for office).

25. Randall is the defendant Joe Beveridge's father-in-law.

26. During that campaign Olathe board member Shannon Wickliffe tweeted before the election "Liars Lie, I will never support a liar in my community" and

posted a picture of a PAC that mailed a flyer contesting Critical Race Theory on behalf of a conservative candidate slate for the board which included Jennifer in the 2021 elections.

27. Jennifer made a timely request to speak at the January 13, 2022, Olathe School board meeting and stated "community" as the reason for her request.

28. Members of the public who are allowed to speak at Olathe school board meetings are allotted the maximum of five minutes of speaking time.

29. The Manual states that the "board president may interrupt or terminate any individual's statement if it is disruptive, not germane to the business activities of the board, or in violation of Kansas Statutes regarding meetings or activities of the board."

30. The Manual states that the "board president may deny any individual speaking privileges if previous conduct of the individual has indicated that the orderly conduct of a meeting may be threatened by that person's appearance.  The president has the option to stop the proceedings and poll the board to determine if a speaker may continue." Given the occurrence of January 13, 2022, Jennifer is subject to this speaking privilege ban.

31. However, the Olathe Board has additional policies on this which is contained in its "PUBLIC PARTICIPATION REGISTRATION CARD" which also states "I have read and understand the above information" and requires a signature.

32. The Registration Card contains the same policy language but then adds two paragraphs of additional policies / conditions:

8. During an open session, the Board shall not hear personal attacks, or rude or defamatory remarks of any kind about any employee or student of the School District or any person connected with the School District. The Board will also not accept public comments containing vulgar or obscene language. Any individual wishing to make a complaint about school personnel shall submit the complaint in writing to the Superintendent. If the complaint involves the Superintendent it shall be submitted in writing to the President of the Board.
9. The Board at its own discretion reserves the right to edit comments for broadcast that are deemed obscene, profane, defamatory, rude, or may violate federal broadcasting laws. Any member of the Board may request that all or a portion of the public comments be stricken from broadcast. The Board member shall identify with specificity which portion he or she would like to strike. This shall be submitted by motion to the Board for an up or down vote.

33. The Olathe School Board conducted on open regular meeting which was open to the public on January 13, 2022.  It was recorded and available for viewing at  https://www.olatheschools.org/Page/2423; https://www.youtube.com/watch?v=1qf_07vq73A

34. The meeting then went to its public comments section. The board recited its Manual requirements referenced above. The comments were limited to two ½ minutes.  The board requested that comments be directed to the entire board, and that "in an effort to respect privacy we ask that speakers refrain from discussing personnel personal complaints involving individual staff members or students."

35. A parent spoke first about masking and the Omicron variant.  She told the board they had "become an administration of insanity."

36. Another parent spoke next about "DEI" program and curriculum, "equity" and "equality." She spoke directly to an Olathe employee "John" in the audience regarding bonds and his printouts.

37. Jennifer spoke next. Jennifer wore a shirt that said "Tested Positive for Critical Thinking With My Old School Olathe Public Education." Jennifer's theme was similar to other parents in that she wanted to press the point that parents had lost trust in the board.  She began stating "Good Evening, I didn't buy my board seat but I am still here because I care about this district." She then was interrupted by one of the board members. Jennifer said "please don't interrupt me." She continued: "We were told prior to enrollment mask would be optional. We are doing the same thing year after year. I agree, Liars Lie but that the only liar that lied in this election was Jim Randall."  This statement was in reference to Wickliffe's tweet and that Jennifer was not the "liar" because she, as a candidate, cannot coordinate with a Political Action Committee and further was unaware beforehand of the mailers that were sent out on her behalf. The phrase "buy an election" has long been in use and one news organization provided a flowchart, "So You Want to Buy an Election? (Flowchart) *Want to blow $10,000 – or $1 million – on the election? This flowchart will show you how.*" https://www.motherjones.com/politics/2011/12/campaign-finance-flow-chart/

38. Beveridge then interrupted Jennifer and said "OK, you're done, you're done. Dr. McMullen remove her.  You're done, you're done"

39. Jennifer calmly asked "why?"  Beveridge said "you're done."

40. Jennifer serenely and incredulously asked "why am I done?" Beveridge repeatedly said "you're done." Jennifer calmly repeated "why am I done?"

41. In a civil tone Jennifer said she had a speech to the board but Beveridge interrupted her again saying "you're done." Each time Jennifer attempted to calmly talk Beveridge interrupted and spoke over her saying over and over "you are done."

42. Beveridge said it was "personal" and Jennifer said "not talking about anything personal." Beveridge said "you mentioned a person." Beveridge continued to raise his voice and was visibly upset.

43. Brent Kiger approached Jennifer and stood at the podium directly facing her with his back to the board indicating Jennifer was being required to leave. Jennifer said it was your brother in law of your sister who is on the board that spent $37,000 dollars for her board seat."

44. At no time was Jennifer disruptive or disorderly and unlike Beveridge she did not raise her voice.  And while Jennifer did not believe what Beveridge was doing was lawful, she complied with Beveridge's unlawful order to leave.

45. Beveridge was visibly upset and then said "I would like to take a five minute break. Does anyone have an objection to that?  OK, we are going to take a five minute break." Beveridge later stated he had "zero misgivings about my decision" that he would not allow anyone at the public comments to "attack family members of the board of education." Beveridge stated that as long as he was board president, "no one will attack family members of any of our board members during public comments."

46. During the break Beveridge said to the board "should I have done that?" No board member responded to Beveridge's question.

47. After the break a parent spoke. She spoke on the mask issue. She also referred to a teacher who refused to greet her child because the child did not wear a mask for medical reasons. She told the board that the one size fits all policy was not ethical.

48. Another parent whose shirt said "disgruntled parent" spoke and called the board's prior actions "political games."  Another parent spoke and suggested the current board policy was only a one way street – from speaker to board – and instead needed to be a dialogue. The speaker also mentioned critical race theory.

49. Another speaker (with a "disgruntled parent" shirt) accused the board of colluding with the county and repeatedly referenced things the board did as "political cover." The speaker said "don't ask us to trust you because we don't."

50. The speaker said "don't troll parents online calling us liars while participating in lying to the electorate."

51. There were other speakers who spoke positively of the board.  All of the speakers except for Jennifer were allowed to speak without interruption.

52. Jennifer was escorted by the defendant Kiger to her chair and picked up her belongings and then was made to go out into the building hallway by the defendant Kiger and defendant Jim McMullen.

53. When Jennifer went into the hallway they told her she was required to leave the building.

54. Jennifer refused initially, said "no," that it was a public meeting.  She told them she intended to go back in the meeting without demanding to speak.  Jennifer

told them she complied with Beveridge's command to stop speaking but that they were also not entitled to remove Jennifer from the meeting. Kiger and McMullen said they would ask Beveridge if he wanted her removed from the podium, meeting, or the building.

55. McMullen returned and told Jennifer that Beveridge was instructing them to have her removed from the building.  There were also two Olathe Police Officers watching this discussion.

56. Jennifer left the building under the instructions of Kiger, McMullen, and Beveridge and told Kiger and McMullen that they were violating her rights.  They responded by saying it was Beveridge who was having her removed from the building.

57. According to YOUTUBE, there have been 5,600 views of Beveridge's confrontation with Jennifer and her censorship removal from the podium.

58. No one, including Beveridge, ever explained to the crowd or to Jennifer why she was not only being prohibited from further speaking but in being required to leave the building.

59. Beveridge made no allegation to Jennifer or to the Board that any action(s) or conduct by Jennifer, other than the content of her speech, was a factor in the defendants' ban, censorship, or public condemnation of her.

60. During her entire comment period, the plaintiff Jennifer spoke from the podium provided for the purpose. She was not seen or accused of making any

improper gestures or taking any physical actions whatsoever other than standing at the podium and speaking normally.

61. At no time did Jennifer do anything notable other than engage in citizen topical protected speech within a designated public forum.

62. The plaintiff Jennifer did not exceed her allotted time for her comments and in fact was not allowed to finish any of her comments.

63. As can be verified from the video record of the meeting, at no time did Jennifer's remarks include any threat or solicitation of violence, any confidential or privileged information, any fighting words or verbal invective, any obscenity, any vulgarity, or even any significant material not topical to the matter under consideration.

64. What Plaintiff's remarks did include were conclusions, beliefs, and opinions about a public and political figure who was not an Olathe board member, and was not an employee of the Olathe School district.

65. Each individual board member was well-aware of the censorship occurring in his or her presence, acquiesced in it, endorsed Beveridge's censorship and punishment of Jennifer as a reaction to her speech.

66. While Beveridge allowed one speaker to specifically accuse an Olathe teacher of discrimination against her child ("teacher who refused to greet her child because the child did not wear a mask for medical reasons) and allowed other speakers to call him and the other board members an "administration of insanity," not being "ethical," and "lying to the electorate," he would not allow Jennifer's

comments about a public figure who was not a board member or employee of the Olathe school district.

67. Jennifer intends to return to the public meetings of the Olathe School board but fears that she will again be subjected to censorship, punishment, and reputational injury. The arbitrary speech restrictions, as written and as applied, chills Jennifer's expression.

68. After this suit was filed January 23, 2022, a hearing for the plaintiff's preliminary injunction motion was set on March 9, 2022, to occur on April 27, 2022. A telephone conference with the Court was set on March 22, 2022 to occur on April 15, 2022.

69. The Olathe School board met on April 7, 2022, to vote on a speech policy amendment.   https://www.youtube.com/watch?v=xC65MTmfkO4.   Beginning   at 1:26:30 the board considers the agenda item 6.12 which is the consideration of modifying the prior public speaking comment policy.  Board member Brian Connell talks extensively about the issue of rushing of this policy amendment. At about the 1.40:45 mark board member Brad Boyd asked if it would be better to just table the motion to change the policy in order to make changes and give an opportunity for review.

70. It appears someone from staff indicates "no" to Mr. Boyd and that member Julie Steele whispers to Mr. Boyd and the word "legal" is faintly heard. Board member Connell continues to talk about the vagueness of the policy and that due to the rush the Board is not being careful. 1:48:00 mark.  He calls it "mishy mushy"

and "gobbly-gooky" language.  He wanted to have the language reviewed again by staff to have it "tightened up."  The Board refused to do so.

71. The Board enacted a revised speech policy which is not substantially different in its application and interpretation regarding public speaking and consequences for a violation of the Board's or any other defendant's speech code. See ECF 26 (Notice of Revised Policy).

72. Under the prior public speaking policy, there was no provision for the removal of a speaker because of a speech code violation.  Under the subsequent speech code enacted, the Board's policy is still silent as to the removal of speakers because of a purported speech code violation.

73. There are other aspects that remain unchanged: the revised speech policy is not content or view point neutral just like the prior policy contained content and viewpoint prohibitions.  The revised policy requires all public comment speech during the public comment time to be "germane to the business of the board."

74. Whether something is "germane" is a relevancy question.  Relevance is a content-based rationale. The Board and each defendant intend to continue in viewpoint discrimination – only this time using an even more vague nomenclature "germane to the business of the board."

75. The defendants each interpret the phrase "germane to the business of the board" as a prohibition on "personal attacks."

76. The defendants interprets the phrase "germane to the business of the board" as a prohibition on obscenity, rudeness, profanity, and vulgarity, In Brent

Kiger's Motion to Dismiss, ECF 13, p. 2, he states the "board president interrupted plaintiff's public comments, which were not germane to the business of the board…."). On page 12 of that motion Kiger states "there is no constitutional right to make personal attacks that are not germane to the business of the school board at a board meeting.")

77. On page 12 of that motion Kiger again states "there is no constitutional right to make personal attacks that are not germane to the business of the school board at a board meeting") and that "Kiger, in his capacity as safety supervisor, was preserving the board room for public comments germane to school board matters…."

78. On page 13 of Kiger's motion he states that "Gilmore's attacks certainly are not relevant or germane to the business activities of the school board…."

## Statements of Law

79. At all times relevant to this Amended Complaint, each and all of the acts and policies alleged herein were attributed to Defendants who acted under color of a statute, regulation, or custom of the State of Kansas (i.e., under color of state law and authority).

80. Defendants knew or should have known that they were violating Ms. Gilmore's constitutional rights in forcing her to be silent at the meeting but then to have her removed from the meeting and then the building.

81. The Board had delegated to the Board President authority at the public meetings. This formal authority continues under any so-called new policy and constitutes an ongoing standard operating procedure of the Board.

82. Mr. Beveridge had final policy making authority regarding removal of Ms. Gilmore and his act itself constituted an act of official government policy of the Board.

83. Each Board member who had final policy-making authority ratified Mr. Beveridge's unconstitutional actions and the unconstitutional decisions and actions of Mr. Kiger and Mr. McMullen and the basis for it.

84. Defendants knew or should have known that they were violating Ms. Gilmore's constitutional rights and will continue to do so by the speech code imposed upon speakers at public meetings and the power provided to the Board or Board president to have the speaker's ability to speak to her elected officials prohibited for an unlimited amount of time regarding one speech code violation.

85. The Board's policy need not have been the product of its legislative actions but have resulted from an edict of a policymaker such as Mr. Beveridge. The policies and practices that have led to the violation of Ms. Gilmore's constitutional rights remain in full force and effect.

86. Mr. Beveridge set in motion a series of acts regarding the removal of Ms. Gilmore by Mr. Kiger and Mr. McMullen and knowingly refused to terminate those acts which he knew or reasonably should have known would cause them to inflict the constitutional injury upon Ms. Gilmore.

87. The Board has a policy of retaliating against speakers in having the speaker removed for a speech code violation. An inference may be drawn from a failure to take remedial action on that violation.

88. The Board has not reprimanded Board President Beveridge or Mr. Kiger or Mr. McMullen in forcing Ms. Gilmore to leave the meeting and the building and instead has defended each defendant's action in having Ms. Gilmore removed.

89. The Board has failed to investigate the incident involving Ms. Gilmore regarding any Board policy or law that authorized Mr. Beveridge, Mr. Kiger, or Mr. McMullen to cause Ms. Gilmore to be removed from the meeting or to prevent its future occurrence.

90. The Board has failed to take any remedial steps regarding the constitutional violation of removing Ms. Gilmore from the meeting and the building which constitutes ratification of ongoing policy and custom of the Board in retaliating against speakers for violating a speech code.

91. The so-called revised policy is not new and still operates in "the same fundamental way" as the prior policy on removing speakers and in its content viewpoint and it has not "sufficiently altered [the circumstances] so as to present a substantially different controversy." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 662, n.3 (1993).

92. The plaintiff is still subjected to the same "residual effect" of the silence existing in both policies regarding the removal of a speaker from an open meeting

17

and from the vagueness of what speech is captured under the "germane to the business of the board" nomenclature.

93. The prior policy, as well as the revised policy, has caused, and continues to cause, the plaintiff to engage in self-censorship. The new language permits "the Board" to sanction Ms. Gilmore for just one speech code violation in having her right to ask to speak or her speaker privilege removed for an indefinite period of time.

94. The Board now deems speaking to the board a "privilege" yet gives all citizens a right to apply to speak. According to the Board's revised policy, speaking to it is a benefit conveyed upon the public.

95. While it may not be required to provide for public comments, once the Board conveys a public benefit and then provides for a treatment of speakers as having this privilege denied for an unspecified amount of time. The policy says the board "may indefinitely suspend" a speaker's ability to speak to the Board during public comments.  This means irrespective of what the speaker wanted to say, it was banned – the speaker is barred saying "anything and everything." *Surita v. Hyde*, 665 F.3d 860, 870, 872 (7th Cir. 2011).

96. Barring a speaker from addressing a government body  (or attending a meeting) is functionally a prior restraint, which is presumptively unconstitutional. *Neb. Press Assoc. v. Stuart*, 427 U.S. 539, 592 (1976). A government agency cannot preemptively ban a citizen from speaking at public meetings. *Mnyofu v. Bd. of Educ. of Rich High Sch. Dist. 227,* No. 15 C 8884, 2016 U.S. Dist. LEXIS 45773, at

*2 (N.D. Ill. Apr. 5, 2016) (school board shut off the microphone in the midst of a citizen activist's speech).

97. This new "indefinite suspension" regarding even one un-warned violation is unreasonable, is not narrowly tailored because prospectively banning a speaker without proof of dangerousness interferes with the speaker's right to interact with elected representatives. *Reza v. Pearce*, 806 F.3d 497, 500-01 (9th Cir. 2015).

98. Under the revised policy, Ms. Gilmore is subjected to an indefinite ban for merely one speech code violation without any evidence of disruption or danger to anyone.  This unreasonably chills her speech. *See Walsh v. Enge*, 154 F. Supp. 3d 1113 (D. Or. 2015) (court enjoined enforcement of a city ordinance that allowed the city to indefinitely ban speakers from city council chambers for disrupting council meetings).

99. Under the revised policy, the Board is permitted to impose retributive penalties that interfere with Ms. Gilmore's ability to communicate with her elected school board officials.

100. Under the "new" policy, merely one violation is enough to have any future speaking by Ms. Gilmore to the board forfeited – literally forever.  Thus, any speaker penalized for a speech code violation cannot speak to the board that others are or would be permitted to speak on the same subject. This is purely reactionary and punitive.  Under the revised policy, speech is penalized and its reactions to what has already been said which is unconstitutional and retaliatory.

101. Ms. Gilmore is suffering irreparable harm from the defendants' continued policies and the way those policies have been enforced.

102. Ms. Gilmore has no adequate or speedy remedy at law to correct the deprivation of her rights by each defendant.

103. The defendants' actions and policies, as set forth above, do not serve any legitimate or compelling state interest, and are not narrowly tailored to serve any such interests.

104. The defendants' policies and related practices are not narrowly tailored as applied to Ms. Gilmore because Ms. Gilmore's expression does not implicate any of the legitimate interests any defendant might have.

105. Unless the policies and conduct of the defendants are enjoined, Ms. Gilmore will continue to suffer irreparable injury.

106. Under 42 U.S.C. §§ 1983 and 1988, Ms. Gilmore is entitled to appropriate relief invalidating Defendants' challenged policies and related conduct.

## FIRST CAUSE OF ACTION

Violation of Plaintiff's First Amendment Right to Freedom of Speech
Retaliation
(42 U.S.C. § 1983)

107. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

108. The Board's policy permitted and permits Ms. Gilmore to designate her own topic "community" for her comments.

109. At no time did any defendant object to Ms. Gilmore's designated topic in any manner including it being too vague as to possibly include the comments Ms. Gilmore made at the public meeting.

110. Ms. Gilmore designated "community" as her topic included the following speech of Ms. Gilmore:

> Good Evening, I didn't buy my board seat but I am still here because I care about this district. We were told prior to enrollment mask would be optional. But I agree, Liars Lie. The only problem is Jim Randall is the only liar in this election cycle. 602,000 people live in Johnson County. Most have gotten covid or flu like symptoms in the past two years. Of the 112,000 positive cases, unfortunately 1% have died, some who sadly, were my friends. But of the 1% who passed, 74% were over the age of 70 and as the CDC released had 4 or more comorbidities. Covid is not affecting children the same way it affected the elderly. ZERO deaths of children under the age of 20 have died in Johnson County thankfully.
> Yes, people die, sadly but what we need is a community WORKING together for those of us here now. I was told in June; we would have a parent advisory committee. Why haven't we started that? I would like to discuss the safety of my daughters in these schools as well as women in general. Why was site council cancelled? With the new state requirements being lowered for emergency substitutes, how will Olathe fill their sub positions? Like I said, I am still here and want to help but we have lost trust in this district's leadership. We will not pass a bond for new schools you continue to close. Thank you.

111. Ms. Gilmore was engaged in constitutionally protected activities when the defendants instructed her to be quiet and then removed her from the meeting and then the building where the public meeting was occurring.

112. Any violation unknown to Ms. Gilmore, her speech made during her allotted time resulted in each of the defendants retaliating against her by not only requiring her to be silent but then to be removed from the meeting and then from the building because of this purported speech code violation.

113. The defendant Beveridge punished Ms. Gilmore because she spoke about one of Beveridge's relatives.

114. By punishing Ms. Gilmore for expressing her views regarding matters of public interest and concerning her topic "community."

115. When Ms. Gilmore communicated her views on "community" she was speaking within that permitted topic, was a matter of public concern, and engaged in expression the First Amendment protects.

116. After Ms. Gilmore was thrown out of the meeting on January 13, 2022, by Mr. Beveridge, an email was sent to the Board members on January 16, 2022, by Thad Snider stating he "was shocked to see the President of the Olathe School Board, Joe Beveridge, had a citizen (Jenny Gilmore) removed from speaking at the school board meeting during her allotted time."

117. Mr. Snider wrote many things including that "Joe Beveridge should resign from the Olathe School Board in disgrace immediately. If Mr. Beveridge does not resign, the rest of the board should vote immediately to remove him from his role as President and sanction his actions or risk being complicit in his behavior and similarly criminal and civilly liable for allowing this action to take place."

118. After this email the Board took no action to sanction or otherwise repudiate the actions of Mr. Beveridge, Mr. Kiger, or Mr. McMullen in removing Ms. Gilmore from the meeting.

119. One Board member did respond: Mr. Beveridge in which he stated:

Thad,

> Just so we are clear, you support the Board of Education allowing public comments to be a time for anyone in the community to attack family members of the board of education?
> You are welcome to that opinion, but as I said in the meeting as long as I am board president, no one will attack family members of any of our board members during public comments.
> Joe Beveridge

120. Mr. Beveridge later wrote Mr. Snider on January 16, 2022, that "I assure you that I had zero misgivings about my decision. And during our five-minute break I heard no complaints from any of the other six board members."

121. On January 24, 2022, Ms. Gilmore received a letter from the Board signed by Michael G. Norris.  In the letter he states it was made "on behalf of the board of education" and then states the "board respectfully disagrees with your assertion that your free speech was violated when your public comments were interrupted by the board president."

122. Mr. Norris further wrote that Ms. Gilmore's speech "was not only a personal attack but also was rude, potentially defamatory, and inherently disruptive.  Further, that comment was not germane to the business or activities of the board of education."

123. Under the interpretation of the Board, Ms. Gilmore's same speech was prohibited under the prior policy and is prohibited under the revised policy.

124. Ms. Gilmore's interest as a parent and former candidate for the school board in discussing matters within her designated topic "community" were of public concern and this outweighs any defendant's interest in orderly or safe conduct during the public comment portion of the public meeting.

125. Ms. Gilmore's speech never prevented the Board from efficiently managing the public comments portion of the public meeting (or even threatened to do so).

126. Defendants District Policies (including the prior and now current policy), their enforcement of those policies, and their threatened future enforcement of those policies would deter a person of ordinary firmness from exercising her right to free speech in the future.

127. Defendants have enforced the District Policies against Ms. Gilmore at least in part because of the view she has expressed of which the First Amendment protects.

128. Defendants each subjected Ms. Gilmore to punishment, retaliation, and discipline because of her speech and continue to do so with any policy used before or now due to the content and viewpoint of Ms. Gilmore's speech.

129. Defendants' District Policies, whether characterized as past or current, and their enforcement of those policies violate Ms. Gilmore's right to free speech as guaranteed by the First Amendment to the United States Constitution.

130. There was no (and still no) admission by any defendant that their respective conduct in having Ms. Gilmore removed from the meeting because of her speech during her allotted public comment time was errant, wrong, or otherwise would not result in the same removal conduct for the same speech to the Board.

131. The revised language enacted by the Board subjects Ms. Gilmore to more adverse consequences for exercising First Amendment rights.  It provides for more

serious and long term and adverse consequences for violation of the content limitation contained in "germane to the business of the board."

SECOND CAUSE OF ACTION

Violation of Plaintiff's First Amendment Right to Freedom of Speech
Content & Viewpoint Discrimination
(42.U.S.C. § 1983)

132. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Amended Complaint as if fully set forth herein.

133. The defendants claim that Gilmore's speech was not germane to the business of the Board and continues to be not germane to the business of the Board.

134. By punishing and threatening to punish Ms. Gilmore with an indefinite suspension of speaking for expressing her views regarding the community,  the defendants have engaged in content and/or viewpoint discrimination in violation of the First Amendment.

135. The Kansas Bill of Rights and the U.S. Constitution's First Amendment protections extend to public speech at the defendants' school board meetings, by state law and the operation of the Fourteenth Amendment.

136. Olathe Board meetings constituted a "limited public forum."  The defendants regulated features of Ms. Gilmore's speech but it was directly related to its content.

137. Defendants' District Policy, as applied to Ms. Gilmore, and facially, require officials to evaluate the content and viewpoint of speakers such as Ms. Gilmore to determine whether it meets the criteria of a personal attack, is obscene,

vulgar, or is germane to the business of the board.  In particular, the Board's use of the nomenclature "germane to the business of the board" as a speech code is deliberately vague as the Board has provided no definition or any workable guideline for a speaker to know what is – or is not – included in that relevancy inquiry.

138. The Board asserted, at the time, that Ms. Gilmore's speech violated a "personal attack" prohibition as justifying her removal – then through its attorney offered a post-conduct reason that the speech was not germane to the business of the board.  The Board continues in the same interpretation at least as far as Ms. Gilmore's prior speech was concerned.

139. The defendants considered the content and viewpoint of Ms. Gilmore's expression when they decided to enforce their District Policies against her and threaten through new verbiage to do so again with even more harsh consequences if Ms. Gilmore continues to express views on the community.

140. The defendants' custom and policies confer unbridled discretion upon each defendant to discriminate against any speaker, including Ms. Gilmore, based on content or viewpoint.

141.  The defendants exercised this unbridled discretion when they retaliated and punished Ms. Gilmore by terminating Ms. Gilmore's speech, then had her removed from the meeting, then had her removed from the building for expressing her views on her chosen topic of community.

142. The defendants' custom and policy speech code restrictions deemed not "germane to the business of the board," "personal attacks, or rude or defamatory remarks" regarding "any person connected with" the School District, "vulgar" "profane," "rude," or "complaint" and "business activities of the Board" violate the First Amendment right of free speech on their face by impermissibly discriminating against speech on the basis of content and viewpoint. The provision "previous conduct of the individual has indicated that the orderly conduct of a meeting may be threatened by that person's appearance" also violates Free Speech. The policies prohibit all speech regarding any "complaint" against any school employee. These prohibitions are not designed to confine the forum to the limited and legitimate purposes for which it was created, but rather, to suppress ideologies and opinions respecting matters properly before the school board with which Defendants disagree.

143. The customs and policies vests unbridled discretion in each of the defendants to define and apply these vague terms.

144. Defendants' customs and policies and their enforcement of those customs and policies are unconstitutionally overbroad because they restrict or otherwise capture a significant amount of constitutionally protected speech.

145. The overbreadth of the customs and policies of the defendants chills the speech of Ms. Gilmore, who seeks to engage in protected expression in her interactions with the public, the school board, and individual members of the school board during the public comments portion of an open meeting.

146. Ms. Gilmore's speech that she gave at the January 13, 2022, meeting, and the rest of the speech she wanted to express but was prohibited from, is protected by the First Amendment.

147. By stopping Ms. Gilmore's speech, and in the manner it was done, and then by using a show of force of two men facing her to leave the podium, and then the meeting, and then the building, the defendants retaliated and punished Ms. Gilmore, embarrassed her, made a public spectacle and example of her, for engaging in expression the First Amendment protects.

148. The defendants' customs and policy or policies and their enforcement of that ongoing speech code policy violate Ms. Gilmore's right to free speech as guaranteed by the First Amendment to the United States Constitution.

## THIRD CAUSE OF ACTION

Violation of Plaintiff's First Amendment Right to Freedom of Speech
Compelled Speech
(42 U.S.C. § 1983)

149. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

150. By punishing Ms. Gilmore for refusing to communicate to the Board in only positive but not negative means, the defendants have attempted and are attempting to compel Ms. Gilmore's speech, in violation of her rights under the First Amendment.

151. The revised language of speech code prohibits "interactions" by board members with the speaker but provides for an exception for the board member to ask "clarifying questions."

152. Mr. Beveridge stated at an April 7, 2022, meeting that he had watched two years of meetings and that he had not seen anything positive or "anything good for the school district" when there were interactions with the Board at a public meeting.

153. The custom and practice of the Board is to allow at all times complimentary or positive comments about anyone or anything. However, the same custom and practice disapproves of uncomplimentary or negative comments about the same subjects and same persons.

154. Defendants' customs and practices in their interpretation and enforcement those policies compel Ms. Gilmore to communicate messages about persons or subjects she does not hold, that she does not wish to communicate.

155. Defendants' District Policies and their enforcement of those policies violate Ms. Gilmore's right to free speech as guaranteed by the First Amendment to the United States Constitution.

## FOURTH CAUSE OF ACTION

Violation of Plaintiff's Right to be Free from Unconstitutional Conditions
(42 U.S.C. § 1983)

156. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

157.   By conditioning Ms. Gilmore's speaker status or her eligibility to speak on her willingness to surrender various constitutional rights, Defendants have imposed and are imposing an unconstitutional condition on her in violation of her First Amendment rights.

158.  Defendants' customs and district policy and their enforcement of those policies impose an unconstitutional condition upon Ms. Gilmore – or any speaker's – right to free speech and their receipt of a state benefit (now called a "privilege" by the Board) to apply to speak or to speak to the Board or to remain in an open meeting.

159.  Defendants' customs and policy and their enforcement of those policies require speakers such as Ms. Gilmore to remain silent or speak only in a way that pleases the Board. They require the speaker to surrender their constitutionally protected rights to freedom of speech, due process, and equal protection to avoid retaliation in being removed from the meeting or future forfeiture of any ability to speak to the Board in the future.

160.  Defendants enforced their ongoing policy and custom against Ms. Gilmore, making it clear that she can only avoid further expulsion from a meeting and embarrassment in terminating her speaking, or in the total loss of any ability to speak to the Board at future public comments forums if she surrenders her constitutionally protected rights to freedom of speech, due process, and equal protection.

161.  Defendants' customs and policy and their enforcement of those policies violate Ms. Gilmore's right to be free from unconstitutional conditions.

## FIFTH CAUSE OF ACTION

Violation of Plaintiff's Fourteenth Amendment Right to
Due Process of Law
(42 U.S.C. § 1983)

162.  Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

163. Supreme Court Justice Thomas explained that the Supreme Court has "become accustomed to using the Due Process Clauses to invalidate laws on the ground of 'vagueness,'" because the vagueness doctrine "is quite sweeping" when a regulation "'authorizes or even encourages arbitrary and discriminatory enforcement.'" *Johnson v. United States*, 135 S. Ct. 2551, 2566 (2015) (Thomas, J., concurring in judgment).

164. Due process is violated by punishing and threatening to punish Ms. Gilmore under vague, overbroad, retroactive, and/or constantly changing policies for her expression at public meetings.

165. Defendants have violated and are violating Ms. Gilmore's right to due process of law under the Fourteenth Amendment.

166. Defendants' District Policies and related practices are overbroad because they encompass a substantial amount of constitutionally protected speech.

167. Defendants' District Policy now subjects Ms. Gilmore to a permanent forfeiture of her ability to speak to the Board or Board members based upon the vague and overbroad policy with no warning or right to be heard.

168. The Defendants' custom and practice are unconstitutionally vague because they grant the defendants unbridled discretion in deciding what constitutes a violation of their speech code, in particular "germane to the business of the board" because their prior nomenclatures and this current germane nomenclature is inherently subjective and elude any precise or objective definition that would be consistent from one official, speaker, board member, to another, because they are incapable of providing meaningful guidance to any defendant, and because they force speakers to guess whether expression that the First Amendment protects is in fact allowed under any topic they choose and then at a public comment public meeting.

169. The lack of objective criteria, factors, or standards in Defendants' District Policies and related practices, including the lack of notice of evolving policies and the unequal treatment of Ms. Gilmore and other similarly situated public speakers renders these policies and practices unconstitutionally vague and in violation of Ms. Gilmore's right to due process of law under the Fourteenth Amendment.

SIXTH CAUSE OF ACTION
Violation of Plaintiff's Fourteenth Amendment Right to
Equal Protection of the Law
(42 U.S.C. § 1983)

170. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

171. By punishing and threatening to punish Ms. Gilmore for expressing her views regarding the topic of community when the defendants would not punish speakers who express opposite views on those same subjects, Defendants have violated and are violating Ms. Gilmore's right to equal protection of the law under the Fourteenth Amendment.

172. By resorting to adverse consequences in terminating her speech and removing her for expressing unfavored views about public community members and in other circumstances allow other speakers to speak about community topics and leaders favorably, the defendants have violated and are violating Ms. Gilmore's right to equal protection of the law under the Fourteenth Amendment.

173. Ms. Gilmore is similarly situated to other public speakers who apply to speak or do speak at a public comments open meeting before the District.

174. Defendants have chosen to take no adverse action against speakers who support or endorse the views of the Board, but they take adverse action against a speaker like Ms. Gilmore who brings up subjects that are personally offensive to a Board member. Defendants take no adverse action against speakers who speak negatively about teachers, staff members, or any range of subjects yet have done so with Ms. Gilmore.

33

175. After taking the many adverse actions against Ms. Gilmore for violating the speech code, the defendants have knowingly refrained from taking adverse actions against other speakers who have purportedly violated the speech code.

176. Defendants' customs, practices, and their enforcement have also been applied to discriminate intentionally against Ms. Gilmore's rights to freedom of speech, right to be free from compelled speech, right to be free from unconstitutional conditions, and right to due process of law. Thus, discriminatory intent is presumed.

177. Defendants' District Policies and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to the District's asserted interests unprohibited.

178. Defendants applied their District Policies and related practices to Ms. Gilmore in a discriminatory and unequal manner, granting other speakers the right to express their views on issues related to community, board members, public issues while denying that right to Ms. Gilmore, in violation of Ms. Gilmore's right to equal protection of the law under the Fourteenth Amendment.

SEVENTH CAUSE OF ACTION
Violation of Kansas Open Meetings Act

179. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

180. The defendant School Board conducted a meeting on January 13, 2022, that was subject to the Kansas Open Meetings Act (KOMA).

181. The plaintiff is a member of the public and the School Board is a public agency as defined under KOMA.

182. The plaintiff attended the meeting on January 13, 2022, but was then improperly excluded by the defendants. It ceased being an open meeting to the public.

183. Each defendant violated KOMA by closing the meeting to the plaintiff or otherwise prohibiting her from remaining in the meeting.

184. Pursuant to KOMA, the burden is upon each defendant to demonstrate the public agency acted in good faith and with a reasonable basis in law.

## PRAYERS FOR RELIEF

WHEREFORE, the plaintiff requests that judgment be entered in her favor and against each defendant as follows:

A. An order enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from ejecting or otherwise removing a speaker who applied and was approved to speak on his or her topic solely because of a violation of a speech restriction related to "germane to the business of the board";

B. An order enjoining defendants from enforcing the Board's relevancy requirement of "germane to the business of board" because it is subject to unbridled discretion in its interpretation and unconstitutionally vague;

C. An order enjoining defendants from enforcing the Board's custom or policy prohibiting an "attack" on "family members" of the board, or speech related to "personal attacks, or rude or defamatory remarks" regarding "any person connected with" the School District.

D. Declaratory relief consistent with the injunction, to the effect that Olathe School Board Policy with its speech prohibitions described above are unconstitutionally void and unenforceable as they violate the First Amendment rights of free speech and petition, and the Fourteenth Amendment's guarantee of due process against vague laws; declaring that the public agency Olathe School Board violated KOMA.

E. An award of damages to the plaintiff;

F. An award of nominal damages to the plaintiff.

G. Against each defendant an award of punitive and exemplary damages to the plaintiff;

H. Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; All of the relief available under KOMA including attorney fees and any other relief as the Court deems just and appropriate.

DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable herein.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:            913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff

## DECLARATION UNDER PENALTY OF PERJURY

I, Jennifer Gilmore, a citizen of the United States and a resident of the State of Kansas, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing, that the foregoing is true and correct to the best of my knowledge (except as to statements made on information and belief, and those I believe to be true and correct), and that the foregoing statements that pertain to me are based on my personal knowledge.

I have historically attended public meetings involving the Olathe School Board and have spoken at those meetings. I intend to do so in the future and at the next public meeting. However, because of the speech code and conduct of the Board at the January 13, 2022, meeting, I am unsure of what I might say at a public comment section without violating its speech code. I am unsure that if or when I violate the speech code that I would again be expelled from the meeting and the building. I am unsure of what "germane to the business of the Board" means and then if I violate that I am subject to an indefinite suspension of any right or opportunity I have to speak again to the Board.

I would like to publicly comment on the fact Joe Beveridge and his board member sister in law are biased and self-interested in each other regarding their school board member functions. I would like to comment that the school board should not have family members or that kind of family relationship on the Board for many reasons. I also want to share that the Board's speech policies are unconstitutional and that what they did to me was rude, wrong, outrageous, and personally retaliatory. I would like to discuss that their speech policy is unconstitutional and subject to abuse as demonstrated in what happened to me. I haven't shared those opinions with the Board at a public meeting yet and do not intend to do so because of the defendants' policies and their application of them.

Executed this 19th day of April 2022.

Jennifer Gilmore