IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JENNIFER GILMORE, | |
| Plaintiff, | |
| v. | Case No. 2:22-cv-02032-HLT-RES |
| JOE BEVERIDGE, et al., | |
| Defendants. | |

**MEMORANDUM AND ORDER**

This case stems from Plaintiff Jennifer Gilmore's removal from a January 2022 Olathe School Board meeting because of comments she made during the public-comment period. Gilmore asserts various claims under the First Amendment's free-speech provision, the Fourteenth Amendment's guarantees of due process and equal protection, and the Kansas Open Meetings Act ("KOMA") against Defendants Joe Beveridge, Brent Kiger, Jim McMullen, the Olathe Board of Education, and the Olathe School District. Kiger and McMullen move to dismiss all claims against them. Docs. 54 and 56. Beveridge, the school board, and the Olathe School District (the "School Board Defendants") move to dismiss Gilmore's due-process, equal-protection, and KOMA claims. Doc. 67.

As discussed below, the Court grants Kiger's and McMullen's motions because they are entitled to qualified immunity on Gilmore's 42 U.S.C. § 1983 claims, and it declines to exercise supplemental jurisdiction over any KOMA claim asserted against Kiger and McMullen. Kiger and McMullen are therefore dismissed from this case. The Court also grants the School Board Defendants' motion as to Gilmore's due-process and KOMA claims but denies the motion to dismiss Gilmore's equal-protection claim to the extent it is based on a First Amendment violation.

**I.      BACKGROUND**

The following facts are taken from the well-pleaded allegations in the amended complaint. *See* Doc. 38. Gilmore is a parent with a student in the Olathe School District. *Id.* ¶ 1. Defendant Joe Beveridge was an elected school-board member and president of the school board during the relevant times. *Id.* ¶¶ 7-8. As school-board president, he oversaw the school-board meetings. *Id.* ¶ 8. Beveridge also oversaw Kiger, the Director of Safety Services for the school district, and McMullen, the Assistant Superintendent of Middle School Education. *Id.* ¶¶ 10, 12-13. Beveridge is sued in both his individual and official capacities. Kiger and McMullen are sued in their individual capacities.

Gilmore ran for a seat on the Olathe School Board in 2021. *Id.* ¶ 23. She lost to Julie Steele. *See id.* ¶ 24. Steele's father, Jim Randall, helped with Steele's campaign. *Id.* Randall is a Johnson County Republican precinct committeeman, and he is also Beveridge's father-in-law. *Id.* ¶¶ 24-25. Accusations of lying were made during the campaign. *See id.* ¶ 26.

The public may attend school-board meetings. *Id.* ¶ 21. The public may also address the board during an allotted time. *Id.* ¶ 28. Gilmore made a request to speak at the January 13, 2022 school-board meeting. *Id.* ¶ 27. Gilmore filled out a card indicating that she wished to speak about "community." *Id.* Gilmore was wearing a shirt that said "Tested Positive for Critical Thinking With My Old School Olathe Public Education." *Id.* ¶ 37. When she began speaking, the following interaction occurred between her and Beveridge.[1]

> Gilmore:      Good evening. I didn't buy my board seat, but I'm
>                       still here because I care about –
>
> Beveridge:   You know what –

---

[1] The amended complaint and briefing provide links to the video, which can be viewed at https://www.youtube.com/watch?v=1qf_07vq73A.

2

Gilmore: – this district. Don't interrupt me, please. We were told prior to enrollment that masks would be optional. We're doing the same thing year after year. I agree that liars lie, but the only liar that lied in this election was Jim Randall. So let's –

Beveridge: OK, you're done. You're done. Uh, Dr. McMullen remove her.

Gilmore: Why am I done?

Beveridge: You're done. You are done.

Gilmore: Why am I done?

Beveridge: You're done. We're not doing this.

Gilmore: I was talking to the board with a speech –

Beveridge: You are done.

Gilmore: – that I can provide you.

Beveridge: You are done.

Gilmore: Excuse me?

Beveridge: You are done –

Gilmore: Mr. President –

Beveridge: – we are not going to talk about persons. We're not going to –

Gilmore: – I'm not talking about persons.

Beveridge: You mentioned a person.

Gilmore: Your father-in-law, of your sister that's on the board that spent $37,000 for her board seat.

Beveridge: I would like to take a five minute break, does anyone have an objection to that? Okay, we're gonna take a five minute break.

3

*See id.* ¶ 33. Following this interaction, Kiger approached Gilmore at the podium, stood facing her, and indicated that Gilmore must leave. *Id.* ¶ 43. Kiger escorted Gilmore to her chair to retrieve her belongings and then Gilmore was made to go out into the hallway by Kiger and McMullen. *Id.* ¶ 52. Once in the hallway, they told Gilmore she was required to leave the building. *Id.* ¶ 53. Gilmore initially refused and said she intended to go back into the meeting. *Id.* ¶ 54. Kiger and McMullen said they would ask if Beveridge wanted Gilmore removed from the podium, meeting, or building. *Id.* McMullen went to ask and on returning, he said that Beveridge was instructing them to have Gilmore removed from the building. *Id.* ¶ 55. Gilmore left the building as instructed by Kiger, McMullen, and Beveridge. *Id.* ¶ 56.

Other members of the public spoke at the January 13 meeting. One parent spoke about masking and Covid-19. *Id.* ¶ 35. Another spoke about diversity education. *Id.* ¶ 36. Other parents spoke after the break, including about masks, how the school board's "one size fits all policy was not ethical," about how the board was playing "political games," and that parents don't trust the school board. *Id.* ¶¶ 47-50. Beveridge allowed speakers to accuse teachers of discrimination and allowed another to call the school board an "administration of insanity" and accuse them of being unethical and of lying. *Id.* ¶ 66. Others spoke positively of the board. *Id.* ¶ 51. No one besides Gilmore was interrupted. *Id.*

The policy in place at the time that governed public participation at meetings was Policy BCBI, last revised in September 2021. Doc. 55-1.[2] Policy BCBI stated that the "primary role of a Board of Education is to transact the business of the school district." *Id.* Policy BCBI allowed the

---

[2] The amended complaint does not attach the policy, though it does quote it. *See* Doc. 38 at ¶¶ 22, 29-30. The policies are attached to the motions to dismiss, however, and thus are properly considered. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

school board president to interrupt or terminate disruptive statements or statements "not germane to the business activities of the board." *Id.* It also set a time limit and permitted the school board president to deny anyone speaking privileges if previous conduct indicated that the meeting may be disrupted. *Id.*

The Public Participation Registration Card that Gilmore filled out had additional guidance. *See* Doc. 55-2. It laid out the procedures for those wishing to speak, provided a time limit of up to five minutes, and stated that the school board president may deny speaking privileges to anyone whose statement is disruptive or "not germane to the business or activities of the Board." *Id.* It also stated that "the Board shall not hear personal attacks, or rude or defamatory remarks of any kind about any employee or student of the School District or any person connected with the School District," and prohibited vulgar or obscene language. *Id.*[3]

Gilmore asserts seven claims, mostly under 42 U.S.C. § 1983. It appears all claims are against all Defendants. The first § 1983 claim is for First Amendment retaliation. Doc. 38 at ¶¶ 107-31. The second § 1983 claim is for content and viewpoint discrimination under the First Amendment. *Id.* ¶¶ 132-48. The third § 1983 claim is a First Amendment claim for compelled speech. *Id.* ¶¶ 149-55. The fourth claim is a § 1983 claim alleging violation of "Plaintiff's Right to be Free from Unconstitutional Conditions." *Id.* ¶¶ 156-61. The fifth § 1983 claim is for violation of the Fourteenth Amendment right to due process of law based on the vagueness and overbreadth of the school board's policy for public speakers at meetings. *Id.* ¶¶ 162-69. The sixth § 1983 claim

---

[3] Both Policy BCBI and the Public Participation Registration Card have been revised since the incident with Gilmore at the January 13 meeting. *See* Doc. 26. The Court discussed the revised policy and participation card at length in deciding Gilmore's motion for a preliminary injunction. *See generally* Doc. 70. But the revised policy and card are not relevant to the pending motions to dismiss, which focus on the events of January 13, 2022, and do not address claims for prospective relief under the revised policy and participation card.

5

is for violation of equal protection under the Fourteenth Amendment. *Id.* ¶¶ 170-78. The seventh claim alleges violation of KOMA. *Id.* ¶¶ 179-84. All claims arise out of the January 13 incident.

## II.   STANDARD

Defendants all move to dismiss under Rules 12(b)(6) and Rule 12(c).[4] A motion under Rule 12(c) is evaluated using the same standard as a motion under Rule 12(b)(6). *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it is accompanied by sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotations omitted). In undertaking this analysis, the Court accepts as true all well-pleaded allegations in the complaint, though it need not accept legal conclusions. *Id.* Likewise, conclusory statements are not entitled to the presumption of truth. *Id.* at 678-79.

## III.   ANALYSIS

Before the Court are three motions to dismiss. Kiger and McMullen have filed similar motions to dismiss that ask the Court to find that they are entitled to qualified immunity on claims one through six—all of Gilmore's § 1983 constitutional claims against them—and that the Court should decline to exercise supplemental jurisdiction over Gilmore's KOMA claim. *See* Docs. 54-

---

[4]   Defendants have all filed answers. Docs. 41, 42, 46, 47, and 48.

57.[5] The School Board Defendants separately move to dismiss counts five through seven—Gilmore's due-process, equal-protection, and KOMA claims. Doc. 68 at 6.

### A.     Motions to Dismiss by Kiger and McMullen (Docs. 54 and 56)

#### 1.     Qualified Immunity - § 1983 Claims

Kiger and McMullen both assert qualified immunity on all of Gilmore's § 1983 claims. Qualified immunity is meant to protect public servants—"all but the plainly incompetent or those who knowingly violate the law"—from the burdens of lawsuits. *Lewis v. Tripp*, 604 F.3d 1221, 1224-25 (10th Cir. 2010). Once a defendant asserts qualified immunity, the plaintiff must show that: (1) the defendant's actions violate a constitutional right and (2) the constitutional issue was clearly established at the time of the defendant's actions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). Where qualified immunity is raised in a motion to dismiss, a court analyzes the issue based on the allegations in the complaint. *Myers v. Brewer*, 773 F. App'x 1032, 1036 (10th Cir. 2019) ("At the motion to dismiss stage, it is the defendant's conduct as alleged in the complaint that is scrutinized for objective legal reasonableness." (internal quotation and citation omitted)). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (citation omitted).

As explained above, Gilmore asserts six constitutional claims. Four ostensibly assert First Amendment claims. One claim is for a due-process violation, and one is for an equal-protection

---

[5]  Kiger's and McMullen's briefs are similar and generally raise the same arguments in favor of dismissal. Gilmore has responded to both. Docs. 58-59. Gilmore incorporates each response into the other to "avoid duplicative arguments." Doc. 59 at 3; *see also* Doc. 58 at 3. But the responses are different and raise different arguments. Regardless of whether this avoids duplicative arguments, it effectively circumvents the Court's page-limit requirements. *See* D. Kan. Rule 7.1(e). Nevertheless, the Court has considered both responses.

violation.[6,7] All the constitutional claims center around Beveridge's interruption of Gilmore at the January 13 meeting and her subsequent removal from the meeting and building by Kiger and McMullen. The Court may consider either prong of the qualified-immunity analysis first. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Here, the Court focuses on whether the alleged constitutional claims asserted by Gilmore against Kiger and McMullen are "clearly established."

Kiger and McMullen are only specifically referenced in 14 and 12 paragraphs, respectively, of the 184-paragraph amended complaint. The factual allegations pertaining to them are that, after Beveridge ended Gilmore's comments, Kiger approached Gilmore at the podium and indicated she was being required to leave. Doc. 38 at ¶ 43. Kiger then escorted her to her chair to retrieve her belongings, and then both Kiger and McMullen directed her into the hallway. *Id.* ¶ 52. Once in the hallway, Kiger and McMullen said they would ask Beveridge if he wanted her removed from the building, and then McMullen told Gilmore that Beveridge was instructing them to have her removed from the building. *Id.* ¶¶ 54-55.

The Court must consider whether the conduct specifically attributable to Kiger and McMullen plausibly states a clearly established constitutional violation. *See Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that

---

[6] In response to Defendants' argument that she has failed to state a due-process claim, Gilmore argues that KOMA creates a protected liberty interest in attending school-board meetings. *See, e.g.*, Doc. 58 at 17. Defendants argue that a due-process claim based on a protected liberty interest to attend meetings under KOMA is not stated in the amended complaint. The Court agrees. The amended complaint includes separate claims for violation of Gilmore's due-process rights and for violation of KOMA. The due-process claim alleges that the public participation policy is unconstitutionally vague and overly broad. Doc. 38 at ¶¶ 162-69. The KOMA claim states that Defendants "violated KOMA by closing the meeting to the plaintiff or otherwise prohibiting her from remaining in the meeting." *Id.* ¶¶ 179-84 (emphasis added). Neither of these claims can be read, either together or separately, to assert a due-process claim based on a liberty interest created by KOMA. Even if Gilmore had pleaded this claim, the Court questions its viability. *See Boster v. Philpot*, 645 F. Supp. 798, 808 (D. Kan. 1986) ("The Kansas Open Meeting Act confers no constitutional rights.").

[7] In response to Kiger's motion to dismiss, Gilmore states that she "has stated a 42 U.S.C § 1983 civil rights claim for deprivation of her Fourth Amendment right to be free from unlawful seizure." Doc. 58 at 6. But there is no Fourth Amendment claim in the amended complaint.

each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) ("Because § 1983 and *Bivens* are vehicles for imposing personal liability on government officials, we have stressed the need for careful attention to particulars, especially in lawsuits involving multiple defendants."). In other words, the Court cannot consider the actions of Beveridge, Kiger, and McMullen collectively. It must consider whether Kiger's and McMullen's own actions violated a clearly established constitutional right.

Gilmore concedes that neither Kiger nor McMullen drafted the public-participation policy. Doc. 58 at 6. Rather, she asserts they are liable for <u>enforcing</u> the policy. Thus, the inquiry is whether reasonable individuals in Kiger's and McMullen's positions—the Director of Safety Services and Assistant Superintendent—would understand that escorting Gilmore out of the meeting and the building at Beveridge's direction after Beveridge terminated Gilmore's speaking privileges violated the First and Fourteenth Amendment. *See Smith v. City of Lawrence, Kan.*, 2020 WL 3452992, at *4 (D. Kan. 2020).

To meet this standard, the contours of the right must be sufficiently clear so that the official would know that what he was doing violated the right. *Medina*, 252 F.3d at 1128. It is not enough to point to the existence of a right at a high level of generality—the question is whether the specific conduct of the defendant is clearly prohibited. *al-Kidd*, 563 U.S. at 742 ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."). There doesn't need to be a case directly on point, but judicial precedent must have "placed the statutory or constitutional question beyond debate." *Id.* at 741.

Here, Gilmore has not met her burden of identifying authority that would put Kiger or McMullen on notice that their actions were unconstitutional. The cases cited by Gilmore do not involve claims against individuals in the place of Kiger and McMullen. *See generally* Doc. 59. Rather, they focus on the person who makes the determination to terminate speaking rights, which in this case was Beveridge. *See* Doc. 38 at ¶ 10 ("As the Board President, defendant Beveridge directly oversees the defendant Kiger and McMullen regarding the cessation of speaker's speech and their removal from the public meeting and the building."); *see also id.* ¶ 29 (stating that the policy authorizes the board president to interrupt or terminate speaker's statements). Gilmore has not directed the Court to any cases involving the so-called enforcers of a policy once the determination to terminate speaking rights has been made by the person authorized to make that determination.[8] Thus, Gilmore has not met her burden to defeat qualified immunity for Kiger and McMullen

Gilmore does cite to *Marshall v. Amuso*, 2022 WL 1003903 (E.D. Pa. 2022), to show that Kiger and McMullen violated clearly established law. But to the extent Gilmore relies on the facts of *Marshall* itself, this does not satisfy her burden under the qualified immunity analysis. *Marshall* was decided April 4, 2022—a few months after the January 13, 2022 meeting at issue here. Thus, Kiger and McMullen could not have relied on it.

---

[8] After briefing was complete, Gilmore submitted some supplemental authorities regarding whether Kiger and McMullen violated clearly established law. Doc. 65. The Court has reviewed those authorities. But they do not demonstrate that Kiger and McMullen violated clearly established law. *McBreairty v School Board of RSU 22*, 2022 WL 2835458 (D. Me. 2022), involved a letter from a school district banning the plaintiff from school board meetings for 7 months. *McNeally v. HomeTown Bank*, 2022 WL 2220922 (D. Minn. 2022), involved a prospective ban by a superintendent in retaliation for a Facebook post. Finally, *Schnekloth v. Deakins*, 2022 WL 1050380 (W.D. Ark. 2022), involved a claim against the presiding officer of a meeting, not the individuals who actually enforced the removal. None of these cases are factually on point or establish that the actions of Kiger and McMullen amount to a clearly established constitutional violation. All of these cases were also issued after Gilmore was removed from the school board meeting in January 2022.

*Marshall* does state that "under controlling Supreme Court and Third Circuit precedent, citizens have—and have had—a clearly established constitutional right not to be discriminated against based on their viewpoints unless such discrimination is necessary to further a compelling governmental interest." *Marshall*, 2022 WL 1003903, at *8. But the only case cited by *Marshall* for that proposition was *Monteiro v. City of Elizabeth*, 436 F.3d 397 (3d Cir. 2006). In that case, the only remaining defendant was the presiding officer of the meeting who had ordered the plaintiff's removal. The officers who actually did the removing had previously been dismissed. *See id.* at 402.

Gilmore argues that general principles against viewpoint discrimination are sufficient to show a clearly established right to defeat qualified immunity, and that in the face of such a plain constitutional violation, she need not find "another case involving a 'purple cow.'" Doc. 58 at 11 (quoting *Butler v. Bd. of Cnty. Commr's for San Miguel Cnty.*, 920 F.3d 651, 668-69 (10th Cir. 2019) (Lucero, J. dissenting)). But the Court disagrees that Gilmore has stated such a clear constitutional violation by Kiger and McMullen. At most, the only facts alleged are that Kiger and McMullen escorted Gilmore out of the meeting[9] and then told her that Beveridge wanted her to leave the building. To the extent Gilmore has alleged plausible viewpoint discrimination <u>by Beveridge</u>, there are no facts suggesting that Kiger and McMullen acted for any other reason than Beveridge instructed them to act. *See Huggins v. Sch. Dist. of Manatee Cnty.*, 2022 WL 4095065, at *6-7 (M.D. Fla. 2022) (granting qualified immunity to security chief and officer where there was no indication that they removed the plaintiff because of viewpoint or content of speech).

---

[9] Gilmore takes issue with Defendants characterizing their actions as "escorting" Gilmore from the meeting. *See* Doc. 58 at 25 n.9; *see also id.* at 7 n.2. But that is the word used by Gilmore in her complaint. *See* Doc. 38 at ¶ 52 ("Jennifer was escorted by the defendant Kiger to her chair and picked up her belongings and then was made to go out into the building hallway by the defendant Kiger and defendant Jim McMullen.").

The limited authority on this issue that the Court has found—cases where First Amendment violations are asserted against the so-called "enforcers" of speech policies (often officers or other security personnel at public meetings)—suggest that qualified immunity is appropriate for Kiger and McMullen. *See Bernard v. Detroit Pub. Sch. Dist.*, 2015 WL 2124442, at *9 (E.D. Mich. 2015) ("First, the officers could reasonably have relied on Scott's determination that Bernard was out of order for attempting to publicly reveal the personal employee file numbers. Indeed, the Sixth Circuit has recognized that a reasonable officer may have probable cause to believe that a speaker is disturbing a public meeting when he 'is determined to be out of order by the individual chairing the assembly.'" (quoting *Leonard v. Robinson*, 477 F.3d 347, 361 (6th Cir. 2007))); *Nolan v. Krajcik*, 384 F. Supp. 2d 447, 466 (D. Mass. 2005) ("The court concludes that an objectively reasonable officer situated similarly to Krajcik and Fulcher could have reasonably believed that they were not violating Nolan's free speech rights and had probable cause to remove Nolan from the town meeting for disorderly conduct.");[10] *cf. Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979) ("The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws. Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement.").

The case of *Heaney v. Roberts*, 147 F. Supp. 3d 600 (E.D. La. 2015), is factually very similar to this one and supports a finding of qualified immunity for Kiger and McMullen. In *Heaney*, the plaintiff spoke at a Jefferson Parish council meeting. *Id.* at 603. He eventually began

---

[10] In *Nolan*, the officers approached the plaintiff without any direction from the presiding officer, and the court found that a reasonable officer could have considered the things the plaintiff was saying as "fighting words." *Nolan*, 384 F. Supp. 2d at 466. Although there is no suggestion here that Gilmore was using "fighting words," Gilmore's removal was directed by Beveridge and was not spontaneously undertaken by Kiger and Gilmore.

challenging the opinion of a Parish attorney. A councilman interrupted him and directed a police officer, who was also named as a defendant, to remove the plaintiff from the meeting. *Id.* The officer and the plaintiff got into a physical scuffle before the plaintiff was forcibly removed from the building. *Id.*[11] The plaintiff subsequently sued both the councilman and the officer for First and Fourth Amendment violations. *Id.* The court declined to dismiss the councilman because there were questions about his motive in silencing the plaintiff, i.e. whether it was because he was being disruptive or because of his viewpoint. *Id.* at 606-08. However, the court concluded that the officer was entitled to qualified immunity. *Id.* at 609-10. Although qualified immunity is not available to "officers who merely carry out the orders of their superiors . . . on that basis alone," the court concluded that "no officer in Black's position would have understood that acting in obedience to a presumptively valid request by the council chairman to remove a citizen following an argumentative exchange with a council member would violate that citizen's First Amendment rights." *Id.*

In view of this, and, more importantly, in the absence of on-point authority from Gilmore, the Court cannot find that Kiger and McMullen violated any clearly established constitutional right when they escorted Gilmore out of the meeting and told her that Beveridge wanted her to leave the building. This is not to say that so-called "enforcers" can never be held liable for a constitutional violation. *See id.* (noting that qualified immunity is not automatically available to "officers who merely carry out the orders of their superiors . . . on that basis alone"); *DeFillippo*, 443 U.S. at 38 (noting "the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws"). But the minimal facts alleged against Kiger and McMullen in this case do not provide any footing to do so here. Kiger

---

[11] There are no allegations that Kiger and McMullen physically touched Gilmore.

13

and McMullen are therefore entitled to qualified immunity on Gilmore's § 1983 claims against them.[12]

### 2. KOMA Claim

Kiger and McMullen also request that the Court decline supplemental jurisdiction over Gilmore's KOMA claim against them if all the federal claims are dismissed. Docs. 54, 56. Under 28 U.S.C. § 1367(a), "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." But a court may decline supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Declining supplemental jurisdiction is within a court's discretion. *See Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009).

Here, the Court has found that Kiger and McMullen are entitled to qualified immunity on all of Gilmore's federal claims. Because all federal claims against Kiger and McMullen are dismissed, the Court declines to exercise supplemental jurisdiction over Gilmore's KOMA claim against them as well.[13]

### B. Partial Motion to Dismiss by School Board Defendants (Doc. 67)

The School Board Defendants separately move to dismiss Gilmore's due-process, equal-protection, and KOMA claims (counts five through seven) for failure to state a claim. Doc. 67.

---

[12] As explained above, all of Gilmore's claims focus on the same conduct by Kiger and McMullen. Although Gilmore discusses some of her theories separately, none of the authorities cited address the conduct of Kiger and McMullen with the requisite specificity as to any of the claims asserted. *See, e.g.*, Doc. 58 at 12 (discussing general principles of First Amendment retaliation). In other words, Gilmore hasn't demonstrated a clearly established constitutional violation by Kiger or McMullen under any of her theories under the First or Fourteenth Amendments. Kiger and McMullen are therefore entitled to qualified immunity on all of Gilmore's § 1983 claims.

[13] As discussed below, Gilmore fails to state a KOMA claim. However, Kiger and McMullen do not move on that claim substantively.

The Court first addresses Gilmore's equal-protection claim and then addresses her due-process and KOMA claims together, given that Gilmore's arguments link them.

### 1. Equal Protection

The School Board Defendants move to dismiss Gilmore's equal-protection claim because it is premised on a First Amendment violation and should be analyzed in that context. They also argue that Gilmore has not stated a plausible equal-protection claim because Gilmore has not identified anyone who made substantially similar comments as her but was treated differently. Gilmore concedes that her equal-protection claim is based on a violation of her First Amendment rights and that the claims "rise and fall together." Doc. 69 at 8-9. But she contends she was treated unequally under the public-participation policy because she was stopped from making a "personal attack" while others were permitted to do likewise. *Id.* at 11 ("Personal attacks are allowed against teachers or staff members but not about a 'person unrelated to the board.' But that is precisely the kind of unequal treatment in speakers the equal protection clause encompasses.").

Frankly, the Court struggles to follow the basis for Gilmore's equal-protection claim. But it appears to turn on the reason Gilmore was removed from the meeting, which is disputed and not appropriate for resolution at this stage of the case. Accordingly, because both parties agree that Gilmore's equal-protection claim is linked to her First Amendment claims, the Court will deny the motion to dismiss at this stage. However, any equal-protection claim by Gilmore will be limited to a First Amendment violation.

### 2. Due Process and KOMA

The School Board Defendants argue that any due-process claim asserted by Gilmore based on a First Amendment violation is subsumed into the First Amendment analysis. This is correct. *See Hirt v. Unified Sch. Dist. No. 287*, 2019 WL 1866321, at *9 (D. Kan. 2019) ("[A]ny due-

process claims based on First Amendment violations are subsumed into the First Amendment analysis."). The School Board Defendants separately argue that Gilmore has failed to plead a plausible violation of KOMA. This is also correct. As this Court has previously found in another case involving an individual's prohibition from entering school property, including school board meetings, KOMA is not violated because one individual is excluded:

> KOMA does not guarantee attendance for every individual. *See* K.S.A. § 75-4318(g)(4) (providing exceptions to the open meetings law, including "if otherwise provided by state or federal law"). In determining whether KOMA has been violated, the Kansas Court of Appeals has instructed courts to "overlook mere technical violations where the public body has made a good faith effort to comply and is in substantial compliance with the KOMA, and where no one is prejudiced or the public right to know has not been effectively denied." *Stevens v. Bd. of Cty. Comm'rs*, 710 P.2d 698, 701 (Kan. Ct. App. 1985).
>
> Hirt claims that Defendants violated KOMA by excluding him because he is a member of the public. . . .
>
> The undisputed facts establish that Defendants substantially complied with KOMA. KOMA provides only that meetings should be open to the public, and there are no facts presented that the school board meetings were not open to the public—only that Hirt was temporarily prohibited from coming on school property. As noted above, KOMA does not guarantee attendance for every individual. Hirt's argument that the school board meetings were not open to the public because he could not attend is the type of hyper-technical reading of KOMA disfavored by courts.

*Id.* at *5-6.[14]

Gilmore does not substantively respond to these arguments. Rather, Gilmore conflates the two claims by arguing that the "question is not whether the KOMA was violated (whether the meeting was open even when Ms. Gilmore was not permitted to stay). Rather, the issue is whether

---

[14] Hirt was prospectively and indefinitely barred from being present on any school property, including school board meetings. *Hirt*, 2019 WL 1866321, at *15-17. By contrast, Gilmore was only removed for part of a meeting and faces no prohibition on returning to future meetings.

KOMA gives rise to a liberty interest that implicates the procedural protections of the Due Process Clause." Doc. 69 at 16. But as explained above, the amended complaint does not assert a due-process claim based on a liberty interest created by KOMA. *See supra* note 6.

Accordingly, Gilmore's due-process and KOMA claims must be dismissed.[15]

## IV. CONCLUSION

In summary, all claims against Kiger and McMullen are dismissed. Gilmore's due-process and KOMA claims against the School Board Defendants are also dismissed. Gilmore's equal-protection claim against the School Board Defendants survives to the extent it is based on a First Amendment violation. Gilmore's First Amendment claims against the School Board Defendants, which are not at issue in any motion, also remain in the case.

THE COURT THEREFORE ORDERS that Kiger's Motion to Dismiss (Doc. 54) is GRANTED. Kiger is entitled to qualified immunity on Gilmore's § 1983 claims. The Court declines to exercise supplemental jurisdiction over Gilmore's remaining KOMA claim. Kiger is dismissed from this case.

THE COURT FURTHER ORDERS that McMullen's Motion to Dismiss (Doc. 56) is GRANTED. McMullen is entitled to qualified immunity on Gilmore's § 1983 claims. The Court declines to exercise supplemental jurisdiction over Gilmore's remaining KOMA claim. McMullen is dismissed from this case.

THE COURT FURTHER ORDERS that the School Board Defendants' Motion to Dismiss (Doc. 67) is GRANTED IN PART and DENIED IN PART. The motion is granted as to Gilmore's

---

[15] Gilmore asserts vagueness and overbreadth challenges to the public participation policy in her due-process claim. Neither side addresses this. To the extent this analysis underlies her First Amendment claims, she may still make those arguments in that context.

due-process and KOMA claims. The motion is denied as to Gilmore's equal-protection claim to the extent the claim is based on a First Amendment violation.

    IT IS SO ORDERED.

Dated: November 18, 2022                    /s/ *Holly L. Teeter*
                                                  HOLLY L. TEETER
                                                  UNITED STATES DISTRICT JUDGE