# EXHIBIT 1

DECLARATION OF ATTORNEY LINUS L. BAKER

I, Linus L. Baker, state the following:

1. I am counsel for Plaintiff and I offer this declaration in support of the reasonableness of the attorney fees and expenses the plaintiff seeks.

2. I graduated from the University of Missouri Kansas City law school in 1996 and I have been licensed to practice law in state and federal courts of Missouri and Kansas since November 1996 / 1997 in those states respectively. I am also admitted in the 11th, 10th, 8th, and 7th courts of appeal in which I have appeared in briefs and in oral argument.

3. I work with and have cases referred to me by the Alliance Defending Freedom organization which is a non-profit, public interest legal organization that provides strategic planning, training, funding, and litigation services to protect Americans' constitutional rights.

4. I have been a solo practitioner and have obtained favorable outcomes for my clients through trials, dispositive motions, and settlements.

5. I have represented, pro bono and through contingency fee agreements, numerous clients, including employees, students, churches, and other religious based organizations, based upon First Amendment claims and violations. Relatively speaking, few cases survive summary judgment and are successfully tried to verdict under 42 U.S.C.§ 1983. Counsel was dedicated to the notion that if Ms. Gilmore was successful, the speaking policy would change and a finding of a 42 U.S.C. § 1983 violation against Beveridge was well worth the uncertainty of the outcome.

6. Section 1988 provides that this Court may allow the prevailing party to receive reasonable attorney's fees and expenses. This case began in January of 2022 and went to trial in late October 2023 – nearly two years later.

7. The matter was mediated twice – before and after the Court's summary judgment order (ECF 119). The Court also referred the matter to the magistrate for further settlement considerations after trial. The Olathe Board was itself divided on settlement with the majority refusing to settle and, according to one board member, wanted to make Ms. Gilmore an example.

8. This lawsuit was not a series of discrete claims but rather focused on the same core facts and the First Amendment. Claims are interrelated where they "involve a common core of facts" or are "based on related legal theories," and where counsel's time is "devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." **HENSLEY, 461 U.S. AT 435**; "When claims

1

are interrelated in this manner, the district court is not required to sort out the hours devoted to successful claims from those expended on fruitless efforts." MCKNIGHT V. CIR. CITY STORES, INC., 14 F. APP'X 147, 153 (4TH CIR. 2001). Instead, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." HENSLEY, 461 U.S. AT 435. *See* GARRITY V. SUNUNU, 752 F.2D 727 (1984) ("Where, as here, plaintiffs have won a federal claim for which attorneys' fees are allowed to a prevailing party, the question becomes whether the claims on which they lost in the same suit were unrelated to the successful ones (in which event no fees may be awarded for work on the unsuccessful claims), or whether, instead, the losing claims included 'a common core of facts,' or were 'based on related legal theories,' linking them to the successful claim.") (citing HENSLEY).

9. This matter began as complex as it involved the intersection of important issues of constitutional law regarding free speech at school boards and how, if at all, employment law would or could apply such as the "same decision" defense applicable in employment cases. It became more complex once new counsel entered the case and interjected new theories about the defendants' defenses.

10. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." HENSLEY V. ECKERHART, 461 U.S. 424, 435 (1983).[1] To be sure, Ms. Gilmore obtained an outstanding result, securing the core relief she sought in this litigation: the revision of the Olathe Board public speaking policy and her right to speak on a matter of public concern at her public school open meetings. Defendants admit they changed their public speaking policy because of Ms. Gilmore's suit repeatedly calling their change to policy "remedial."

11. Defendants intentionally swapped horses after suit and after the injunction was brought hoping to moot the case by its change to the unconstitutional policy which included unconstitutional prohibitions involving "personal attacks."  But that policy change counts in favor of the plaintiff's success in bringing the lawsuit as it was the moving force for that change. That change benefits all parent speakers in the Olathe School District.

---

[1]

> Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories.  Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

HENSLEY, 461 U.S. 435.

2

12. The facts of this case were connected to every First Amendment legal theory the plaintiff presented. Each was intertwined and interconnected on the same core facts. A "fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Id.* It is the result of the litigation that matters. In "successful litigation, fees should not ordinarily be reduced for unsuccessful procedural, discovery, or other motions." **ALBA CONTE, ATTORNEY FEE AWARDS § 4:18 (3D ED. 2013)**. *See* **WEBB V. SLOAN, 330 F.3D 1158, 1169 (9TH CIR. 2003)** (holding plaintiffs entitled to time spent on unsuccessful summary judgment motion when they ultimately succeeded on some claims therein, and all claims arose from common core of facts); **CRUZ V. TOWN OF CICERO, 275 F.3D 579, 592 (7TH CIR. 2001)** (dismissing argument that plaintiff could not obtain fees for unsuccessful preliminary injunction motion, court remarked that "it is the ultimate outcome of the litigation that determines whether a plaintiff is a prevailing party, not his or her success as to each motion filed in the case"); **KITCHEN V. TTX CO., NO. 97 C 5271, 2001 WL 40803, AT *3 (N.D. ILL. JAN. 17, 2001)** (declining to exclude time spent on unsuccessful preliminary injunction motion because a "losing argument in support of a successful claim for relief is fully compensable time").

13. The **JOHNSON** factors bolster the Lodestar analysis. (**JOHNSON V. GEORGIA HIGHWAY EXPRESS, INC., 488 F.2D 714 (1974)**). The plaintiff had a contingency fee agreement with me.

14. This case was not a desirable one for lawyers in the Kansas City legal community. Few attorneys are familiar with the First Amendment free speech area of the law and even fewer are willing to take on such cases with no guarantee of payment or even the prospect of obtaining a percentage of a substantial damage award.

15. My work advocating for plaintiff's civil rights makes it highly unlikely that business clientele would hire me. It has been recognized that civil rights plaintiff work is oftentimes undesirable, and that civil rights plaintiff's attorneys are economically impacted by their decision to help civil rights litigants. **JOHNSON AT 719** ("civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant"); **STOKES V. CITY OF MONTGOMERY, 706 F. SUPP. 811, 815 (M.D. ALA. 1988), AFF'D, 891 F.2D 905 (11TH CIR. 1989)** ("civil rights litigation … [is] seen as very undesirable because it stigmatizes an attorney as a 'civil rights lawyer' and thus tends to deter fee-paying clients, particularly high-paying commercial clients, from seeking assistance from that lawyer"); **CHALMERS V. CITY OF LOS ANGELES, 676 F. SUPP. 1515, 1524 (C.D. CAL. 1987)** (upward adjustment to lodestar was appropriate in case against city to compensate for risk that attorney would be paid almost nothing for work in prosecuting lawsuit); **GILLESPIE V. BREWER, 602 F. SUPP. 218, 229-230 (N.D.W. VA. 1985)** (lodestar adjusted upward in civil rights lawsuit to compensate for undesirability of case); **JONES V. FEDERATED DEPT. STORES, INC., 527 F. SUPP. 912, 917-18 (D.C. CIR. 1981)** (lodestar enhanced due to undesirability of

civil rights case and contingency factor). Thus, the "undesirability of the case" factor weighs in favor of an upward adjustment of Plaintiff's fee award.

16. Regarding rates, private practice, particularly solo private practice, is much different from "bulk, guaranteed paid legal work" that defense firms are accustomed to. **RAMSEK V. BESHEAR, NO. 3:20-CV-00036-GFVT, 2022 WL 3591827 AT \*8 (E.D. KY. AUG. 22, 2022)** (finding an August 2022, hourly rate of $400 was reasonable).

17. In civil rights actions, the nature and length of the professional relationship with a client do not factor into the fee analysis.

18. This case was not about money or damages but the need for relief that would allow Ms. Gilmore and others the right to speak on matters of public concern and for the defendants to admit their wrongdoing. She did not seek compensatory damages, nor was she entitled to receive any. Ms. Gilmore obtained all the practical relief she sought in this litigation through the changing of the policy and the jury verdict announcing that wrongdoing – attorney fees are appropriate as a vindication of those great successes.

19. The **MARSHALL / CLARKE PENNSBURY** lawsuit, (2:21-cv-04336) lasted a year and contained 90 ECF events. It was very similar to this case ("you're done") which also contained a viewpoint discriminatory policy. The policy was changed and the parties settled agreeing to pay plaintiff's attorney fees of $300,000 and $17.91 in nominal damages. Georgetown University Free Speech Project https://tinyurl.com/mryr6dd9; https://tinyurl.com/yn4r5smd

20. Because of the importance of constitutional rights, federal courts routinely award appropriate fee amounts to litigants who vindicate these and other federal rights. *See, e.g.,* **VEASEY V. ABBOTT, NO. 2:13- CV-193, 2020 WL 9888360, AT \*12 (S.D. TEX. MAY 27, 2020)** (awarding $6,790,333.31 in attorney fees and expenses in protracted civil rights litigation).

21. Defendants vigorously defended the case throughout the litigation, from the outset until final judgment, despite Ms. Gilmore's constant efforts to find a resolution akin to the result she finally received. Pursuing and obtaining this relief for Ms. Gilmore required significant legal research, detailed pleadings, sufficient evidence, and substantial briefing, all of which had to be done timely to be of any use to Ms. Gilmore.

22. The preclusion of other employment is one that weighs heavily in favor of a solo practitioner's requested hourly rate. Because I am a solo practioner, taking on a case of Ms. Gilmore's magnitude precluded me from accepting other cases, which happened, as a result of my representation in this matter.

23. In just two years there were 187 ECF filings in this case. The pretrial and trial work was voluminous, extensive, and laborious. As the Court noted, this case presented far more nuances than a straightforward employment speech discrimination case. There were no model jury instructions for this kind of First Amendment case. These kinds of school board / free speech cases had some precedent but not in all respects. In many ways, the Court was plowing new ground on many issues. The short of that required this counsel to invest in extended research and briefing – and many hours in which were not billed.

24. This case was a nominal damages case – meaning my compensation was dependent not on a damage award but an award of fees. These kinds of cases present a far higher risk of less reward than a typical personal injury or wrongful death contingency fee case.

25. I used billing judgment to not bill at all for any tasks that would normally be done by a paralegal or administrative assistant. I did not bill for non-legal tasks that did not require a lawyer's skill such as organization, retrieving documents, scheduling meetings, or creating binders, the assembly and binding of trial exhibits, the assembling of electronic records for trial in my two laptops.

26. My billing identifying drafting, researching, and editing specific documents which are sufficient to describe the work performed, particularly given the inherently intertwined nature of those tasks.

27. Gilmore has not sought compensation for considerable time that would otherwise ordinarily be billable in the course of representation to a private client, such as time for all communications including telephone conferences with opposing counsel, regular correspondence or all emails with opposing counsel.

28. The emails or telephonic conferences between counsel were necessary particularly with the multiple defense attorneys, who, depending on who was assigned to what, would then respond and, given the complexity of this case, those communications between counsel were necessary and not excessive.

29. My experience, reputation and ability was on display throughout the litigation. Despite being met with the two law firm's insurance paid resources of Norris Kepplinger and Spencer Fane, this solo practitioner was able to migrate through each litigation phase against multiple 2 & 3 simultaneously attorneys hitched to the single defense wagon with success. There is "something to be said for solo practitioners and very small firms that avoid the often duplicative billing that is found when junior and senior attorneys work together." FINCH V. NEW YORK STATE OFFICE OF CHILDREN AND FAMILY SERVICES, 861 F. SUPP.2D 145, 153-54 (S.D.N.Y. 2012). The FINCH Court also pointed out that the fact of a solo practice will also buoy the hourly rate from slipping too far in the other direction due to the value it affords clients.

5

30. Because 1983 is a fee-shifting statute, Plaintiff's counsel contemporaneously keeps records of hours worked in this case. Exhibit 2 is a true and correct copy of the Excel spreadsheet with its detailing the fees and expenses incurred by Ms. Gilmore.

31. As of December 1, 2023, the plaintiff expended over 792.85 hours of professional time. This represents the total number of hours reasonably expended by counsel after the exercise of billing judgment. In reviewing counsel's billing records, counsel did not charge for 143.15 hours of professional time. Ex. 2. The dollar amount sought is $317,300.00. As of November 29, 2023, the defendants had paid $415,803.38 in attorney fees.

32. Attorney Baker maintains a litigation docket. There was a strong incentive to not spend more time on Ms. Gilmore's case other than what was necessary because of other cases that require attention. Plaintiff engaged in numerous required but highly efficient email communications with opposing counsel or his client. Those events were billed in the lowest billing increment of *.1*. All the hours and expenses incurred by Ms. Gilmore were necessary to obtain the outcome attained in defeating summary judgment and in obtaining a trial verdict.

33. After suit was brought and the motion for preliminary injunction filed, the defendants then modified their public speaking guidelines to remove unconstitutional parts that Joe Beveridge relied upon – i.e. personal attacks. Defendants admit this because they claim the revising of the policy was remedial.

34. The Court heard testimony that defendants wanted to make Ms. Gilmore an example. Contrary to the defendants' practice, the plaintiff reduced fees associated with the case by having only one lawyer attend a deposition and trial, and having just one lawyer involved in responding to the summary judgment motion.

35. The issues in the trial presented sophisticated legal questions that had to be proven to both the Court and communicated to the jury. At each turn, Plaintiff was successful. The hours expended in this case were much greater than they otherwise would have been because the views of the parties were so vastly different – particularly after new defense counsel entered the case. It was a highly contested case because of the nuances and novel issues presented to the Court.

36. The Court succinctly set out a roadmap in the summary judgment order (ECF 119) but the efforts to settle this case after that summary judgment proved unavailing.

37. In the contingency fee agreement with Ms. Gilmore, she agreed to my hourly rate of $400.00 per hour. As a lawyer with over 27 years of experience practicing litigation, I have knowledge of reasonable hourly rates for attorneys. There are recent high

inflation rates to now consider that reasonably raises the hourly rates of attorneys. Annual increases in an attorney's billing rates are typical. See **ALMANZA V. BARR, NO. 3:15-CV-389-TAV-HBG, 2019 U.S. DIST. LEXIS 241963, AT *14-15 (E.D. TENN. AUG. 5, 2019)**. Annual increases between three percent (3%) and five percent (5%) are common. **WILLIAMSON V. RECOVERY LTD. P'SHIP, NO. 2:06-CV-292, 2013 U.S. DIST. LEXIS 88962, AT *28 (S.D. OHIO JUNE 25, 2013)**.

38. I consulted with other lawyers, including counsel in other cases. I reviewed publications such as Missouri Lawyers Media, Billing Rates 2022, November 2022 and the USAO Attorneys' Fees Matrix for 2020-2021 ("USAO Matrix"). True and correct copies of the Missouri Lawyers Media, Billing Rates 2022, November 2022 and the USAO Matrix, are attached as exhibit 3 to Plaintiff's motion.

39. For hourly work, I am requesting the rate of $400 per hour which is the rate I have been charging since 2020. This rate is well within published rates for lawyers in the Kansas City market. Ex. 2 at 4.

40. I made reasonable efforts to identify the description of the work in the billing records. "Trial courts need not, and indeed should not, become green-eyeshade accountants." **FOX V. VICE, 563 U.S. 826, 838 (2011)**. Billing records should not be deemed vague if they offer sufficient detail and probative value for the court to determine the legitimacy of the hours expended. *See* **IMWALLE V. RELIANCE MED. PRODS., 515 F.3D 531, 553-54 (6TH CIR. 2008)** (finding time entries such as "conference with," research," "review file," "review documents," etc. sufficiently descriptive when read in context of whole billing statement and the timeline of the litigation). Plaintiff's time records are consistent with these standards.

41. Attorney Baker agreed to handle this case on a contingency fee basis. Attorney Baker bears the risk of not be paid anything for either attorneys' fees or expenses incurred. The fees and expenses incurred by Ms. Gilmore were reasonable and necessary to prevail on her First Amendment claim.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on: December 5, 2023.

/s/ Linus L. Baker